UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHLEEN BANKHEAD, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WINTRUST FINANCIAL CORPORATION; and BARRINGTON BANK & TRUST CO., N.A.,<br><br>Defendants. | Case No. 1:22-cv-02759<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kathleen Bankhead, on behalf of herself and a putative class of Black and/or African Americans, sues Wintrust Financial Corporation ("Wintrust") and Barrington Bank & Trust Co., N.A. ("Barrington") for unlawful discrimination on the basis of race in violation of the Equal Credit Opportunity Act ("ECOA"), 42 U.S.C. § 1981, 42 U.S.C. § 1982, and the Fair Housing Act ("FHA"). [1]. Plaintiff also sues both Defendants for breach of contract, promissory estoppel, and fraudulent inducement. *Id.* Plaintiff voluntarily amended her Complaint in response to a prior motion to dismiss; *see* [22], and both Defendants again move to dismiss all of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). [14]. As a preliminary matter, the Court grants Plaintiff's motion for leave to file a response in excess of 15 pages, [28]. And for the reasons discussed herein, the Court grants

1

Defendants' motion to dismiss, [14], in its entirety. The Court dismisses all counts without prejudice.

## I. Factual Allegations[1]

Plaintiff is an African American attorney and citizen of Illinois. [22] ¶¶ 5, 20. Wintrust is "a conglomeration of banks in the greater Chicagoland area." *Id.* ¶ 3. Barrington is "a national banking association chartered in Illinois," and a Wintrust subsidiary. *Id.* ¶ 4. The Complaint refers to Defendants jointly as "Wintrust," *see* [22] at 1, a practice this Court adopts for purposes of stating the factual allegations.[2]

Plaintiff, a well-qualified home borrower, began communicating with a Wintrust loan originator in 2020 "to obtain a mortgage loan with the lowest rates and most favorable terms in connection with her purchase of a residential real estate in Bronzeville, a majority-Black neighborhood in Chicago." *Id.* ¶ 21. In March 2020, Plaintiff's loan officer told her "that Wintrust would provide her with 'the best structure and rates.'" *Id.* ¶ 22. In March 2020, Plaintiff's loan officer wrote to her that "if rates were to go down, Wintrust could 'float you down for no charge.'"[3] *Id.* ¶ 27.

---

[1] For purposes of the motion to dismiss, the Court draws the facts from the amended complaint, [22].

[2] As discussed below, this conflation of defendants poses a question regarding parent-subsidiary liability. *See infra* § III(D).

[3] The Court construes the word "float down" to refer, in this context, to a mortgage "rate lock float down," which is a financing option that "locks in the interest rate on a mortgage with the option to reduce it if market rates fall during the lock period." Chris B. Murphy, *Mortgage Rate Lock Float Down: Meaning, Overview, Example*, Investopedia (Apr. 13, 2022), https://www.investopedia.com/terms/m/mortgage_rate_lock_float_down.asp.

Plaintiff obtained a home mortgage loan from Wintrust. *Id.* She signed the mortgage on June 3, 2020, with a fixed interest rate of 3.25%.[4] [15-1] at 16. Plaintiff alleges that this rate is "higher than the market rate that Wintrust charged to non-African American customers." [22] ¶ 25. She also claims that Wintrust initially "advertised credits that would have reduced Plaintiff's closing costs," however Wintrust "instead required Plaintiff to apply those credits to extend the 'rate lock,' effectively eliminating the credit." *Id.* ¶ 26.

Plaintiff alleges that Wintrust has "policies and practices to determine eligibility for home loans and refinancing, rates, terms, and conditions." *Id.* ¶ 7. She further claims that the policies and practices "impose higher costs and fees on black and/or African American borrowers, while providing these borrowers with fewer credits to lower closing costs." *Id.* Wintrust uses Fannie Mae's Desktop Underwriter program which "provides recommendation to lenders on whether to approve a mortgage loan and information on a mortgage loan's eligibility for future sale to Fannie Mae." *Id.* ¶ 8. But Desktop Underwriter "does not set the interest rate" and "does not establish costs or fees of a loan." *Id.* Rather, "Wintrust has its own 'proprietary' policies and practices to set rates, costs, and fees," and those "policies and practices include the potential for loan officers to exercise discretion in setting rates, costs, and fees." *Id.*

---

[4] In resolving Defendants' motion, this Court may consider documents incorporated by reference in the pleadings. *See, e.g., Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019); *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017).

To support her claims, Plaintiff cites nationwide data from 2020 reported by Wintrust pursuant to the Home Mortgage Disclosure Act. *Id.* ¶ 9. Plaintiff identifies statistically significant data showing that Black and/or African American borrowers face higher interest rates than white borrowers. *Id.* ¶ 10. For example, "Wintrust originated loans to approximately 73% of white borrowers who applied for a home purchase mortgage through Wintrust Mortgage, compared to only 59.5% of Black and/or African American applicants." *Id.* ¶ 9. Further, in the same year, Wintrust "denied 12% of Black and/or African American borrowers' applications outright, compared to only 5.5% of white applicants." *Id.* ¶ 11.

In 2020, "Black and/or African American borrowers nationwide had to spend, on average, 3.3% of their Wintrust Mortgage loan value on costs and fees, versus 2.9% for white borrowers." *Id.* ¶ 12. Wintrust Mortgage also charged a national average interest rate of 3.31% to Black and/or African American borrowers for home purchase loans "versus 3.21% for white borrowers." *Id.* ¶ 13.

Wintrust Mortgage approved 68.7% of refinancing applications from white applicants versus 56% from Black and/or African American applicants. *Id.* ¶ 15. Wintrust also "denied Black and/or African Americans borrowers' refinancing applications outright 5.6% of the time, versus 3.2% of the time for white borrowers." *Id.* ¶ 16. Overall, in 2020, "the average cost of borrowing for a Wintrust Mortgage refinancing was 2.1% of the loan value for Black and/or African American customers versus 1.7% for white borrowers". *Id.* ¶ 17.

4

Plaintiff alleges that Wintrust implements its policies and practices "with discriminatory intent," causing "an unlawful disparate impact on Black and/or African American borrowers." *Id.* ¶ 19.

## II. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff need not provide "detailed factual allegations" at the pleading stage.[5] *Twombly*, 550 U.S. at 555. Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In evaluating the motion to dismiss, this Court may consider documents incorporated by reference in the pleadings. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017).

When deciding a Rule 12(b)(6) motion, this Court accepts all well-pleaded allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Iqbal*, 556 U.S. at 679. This Court need not accept a complaint's legal conclusions or "threadbare recitals of a cause of action's elements." *Id.* at 663.

---

[5] Plaintiff's fraud claims face a higher pleading standard. To plead fraud, Plaintiff "must describe the 'who, what, when, where, and how' of the fraud." *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (quoting *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)). For the reasons discussed below, however, the Court does not reach the merits of the fraud claims. *See infra* § III(C).

**III. Analysis**

Plaintiff brings race discrimination claims pursuant to four statutes: the Equal Credit Opportunity Act, 42 U.S.C. § 1981, 42 U.S.C. § 1982, and the Fair Housing Act.

In Count One, Plaintiff alleges that Defendants violated the Equal Credit Opportunity Act under theories of disparate treatment and disparate impact discrimination. [22] ¶ 44. The ECOA makes it "unlawful for a creditor to discriminate against any applicant, with respect to any aspect of a credit transaction…on the basis of race." 15 U.S.C. § 1691(a).

In Count Two, Plaintiff alleges that Defendants violated 42 U.S.C. § 1981 under a theory of disparate treatment. [22] ¶ 50. This statute ensures that all citizens of the United States, regardless of race "shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981.

In Count Three, Plaintiff alleges that Defendants violated 42 U.S.C. § 1982 under theories of disparate treatment and disparate impact. [22] ¶ 55. This statute likewise ensures that all citizens of the United States, regardless of race "shall have the same right, in every State and Territory," as is enjoyed by white citizens thereof to "inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

In Count Four, Plaintiff alleges that Defendants violated the Fair Housing Act under theories of disparate treatment and disparate impact. [22] ¶ 61. The FHA makes it "unlawful for any person or other entity whose business includes engaging

in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race." 42 U.S.C. § 3605(a).

Plaintiff's allegations of discrimination—and the legal theories she argues—are materially identical for each count: in Counts One, Three, and Four, the Complaint alleges that Defendant acted in a way that constituted "illegal intentional race discrimination and disparately impacts African Americans," while in Count Two, the Complaint alleges disparate treatment only. [22] ¶¶ 44, 50, 55, 61. The Court thus evaluates Plaintiff's disparate treatment and disparate impact allegations together for purposes of Counts One through Four. *See Watters v. Homeowners' Ass'n*, 48 F.4th 779, 789 (7th Cir. 2022) ("A claim under § 1982 and the FHA both require proof of an intent to discriminate, so the two claims often rise and fall with each other."). And, for the reasons explained below, the Court finds that this data alone remains insufficient to plausibly allege any of the theories of discrimination Plaintiff pursues.

A. **Disparate Treatment**

Purposeful discrimination requires more than "simple knowledge that a particular outcome is the likely consequence of an action." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017). Rather, it requires a defendant to have selected the course of action at least partially because of "its adverse effects upon an identifiable group." *Id*.

As Plaintiff notes, pleading intentional discrimination is often straightforward. For example, in *Swanson v. Citibank,* the plaintiff alleged that specific bank employees intentionally denied her a loan on the basis of her race, and the Seventh Circuit held that these relatively few facts—the type of discrimination, by whom, and when—sufficed to plead intentional discrimination. 614 F.3d 400, 402 (7th Cir. 2010). But where a plaintiff alleges a more complex theory, more is required to render the theory plausible. *See, e.g., McCauley v. City of Chicago*, 671 F.3d 611, 619 (7th Cir. 2011) (distinguishing *Swanson* in the context of allegations that the city's "unwritten custom, practice and policy" gave rise to an equal protection violation).

In contrast to Swanson, Plaintiff has not pursued a straightforward individual claim based upon the loan officer's animus.[6] Instead, she alleges, pursuant to each statute, that "Defendants maintained a set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan and refinancing applicants and recipient that constitutes illegal intentional race discrimination." [22] ¶ 55. It is this "set of uniform… practices" which Plaintiff argues constitutes intentional discrimination. But the Complaint does not support this theory with any factual allegations suggesting racial animus—or suggesting any intent at all.

---

[6] While Plaintiff would in theory be free to allege such an individual claim in the alternative, she has not done so, and instead pursues all of her discrimination claims from a class perspective, challenging Defendants' "uniform" policies and practices. *See generally* [22].

The Complaint alleges that Wintrust's policies "include the potential for loan officers to exercise discretion in setting rates, costs, and fees," but it makes no allegations of discriminatory animus in the officers' exercise of such discretion. Instead, to allege discrimination, Plaintiff simply recites statistics illustrating that, overall, Wintrust approves loans for African American borrowers at lower rates and with worse terms than it does for white borrowers. Plaintiff's data merely shows a disparity in *outcome*, but the Complaint fails to provide any factual basis to connect that disparity to Defendants' intent. As such, Plaintiff's allegations fail to state a claim when evaluated through the disparate treatment lens under the ECOA, 42 U.S.C. § 1981, 42 U.S.C. § 1982, or the FHA.

Because Plaintiff's § 1981 claim is predicated exclusively on a disparate treatment theory of liability, the Court dismisses this claim (Count Two). The Court also dismisses Plaintiff's § 1982 claim (Count Three), because § 1982 claim does not permit disparate impact theories. *See Hall v. Nat'l Collegiate Athletic Ass'n*, 985 F. Supp. 782, 798 (N.D. Ill. 1997) ("[Section] 1981 and § 1982 have been unambiguously interpreted to require purposeful discrimination, and not disparate impact, in order to support a claim.") (citing *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982)).

### B. Disparate Impact

The Court next considers Plaintiffs' allegations of disparate impact discrimination with regard to Counts One (ECOA) and Four (FHA).

9

In contrast to a disparate-treatment case, where a "plaintiff must establish that the defendant had a discriminatory intent or motive," a plaintiff bringing a disparate-impact claim challenges practices that have a "disproportionately adverse effect on minorities" and are otherwise unjustified by a legitimate rationale. *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.* 576 U.S. 519 (2015). A plaintiff states an FHA disparate impact claim by alleging: (1) a statistical disparity; and (2) that the defendant maintained a specific policy; and (3) that policy caused the disparity. *Cty. of Cook v. Wells Fargo & Co.*, 314 F. Supp 3d 975, 990 (N.D. Ill. 2018) (citing *Inclusive Communities*, 576 U.S. at 541–42); *TBS Group, LLC v. City of Zion, Illinois*, No. 16-cv-5855, 2017 WL 5129008 (N.D. Ill. Nov. 6, 2017) (observing that the importance of the causality requirement "prompted the Supreme Court, in *Inclusive Communities Project*, to caution lower courts to evaluate these cases carefully, even at the pleading stage.").[7]

Similarly, a disparate impact claim under the ECOA requires a Plaintiff to: "(1) identify a specific, facially neutral policy or practice adopted by the defendant; (2) allege a disparate impact on a protected group; and (3) show a causal relationship between the challenged policy or practice and the alleged disparate impact." *Pettye v. Santander Consumer, USA, Inc.*, No. 15 C 7669, 2016 WL 704840, at *4 (N.D. Ill. Feb. 23, 2016) (citing *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)).

---

[7] As Plaintiff notes, the Supreme Court decided *Inclusive Communities* on summary judgment and thus did not explicitly articulate a pleading standard. This Court adopts *City of Zion*'s explanation of the pleading standard with reference to *Inclusive Communities*. 2017 WL 5129008 at *8 (evaluating claims at the motion to dismiss stage with reference to the "robust causation" standard and observing that causation "remains a key element of a disparate impact claim: without causation, there is no liability.").

10

*County of Cook v. Bank of America Corporation* illustrates the requirements. No. 14 C 2280, 2018 WL 1561725, at *1 (N.D. Ill. March 30, 2018). There, Cook County sued Bank of America for violations of the FHA, alleging that defendants had targeted African American and Hispanic/Latino home buyers for a predatory equity-stripping scheme. *Id.* The County supported its allegations by describing the various components of the scheme and how it negatively impacted borrowers. *Id.* For example, it cited witness statements suggesting that the defendant "encouraged loan officers to approve loans even when borrowers did not meet underwriting criteria." *Id.* at *2. At the motion to dismiss stage, the court noted that the FHA requires a robust causal connection between a facially neutral policy and any alleged disparities, consistent with *Inclusive Communities*. *Id.* at *8. The court held that plaintiff sufficiently alleged a specific policy with a robust causal connection to the racial disparity because of the detailed explanation of the various components of the scheme and "how those components, and the scheme as a whole, ha[ve] had a disproportionately negative impact on minority borrowers." *Id.* at *9.

Details about the policy at issue may be sufficient to render a disparate impact claim plausible. *See, e.g. Steele v. GE Money Bank*, No. 08-cv-1880, 2009 WL 393860, at *5 (N.D. Ill. Feb. 17, 2009) (permitting a claim to proceed without specific statistics demonstrating that similarly situated non-minority borrowers were treated better, where causation could be fairly inferred based on detailed allegations about the policy at issue); *Pettye v. Santander Consumer, USA, Inc.*, No. 15-cv-7669, 2016 WL 704840, at *6 (N.D. Ill. Feb. 23, 2016) (same); *Miller v. Countrywide Bank, N.A.*, 571 F.

11

Supp.2d 251, 258–59 (D. Mass. 2008) (same). And of course, statistics showing that disparities remain, *after controlling for differences in objective criteria*, can bolster such a claim. But here, Plaintiff offers neither. Instead, the Complaint paints only with a broad brush, identifying categories of policies, *see* [22] ¶ 9 ("policies and practices related to mortgage and refinancing approvals, interest rate determinations, fees, and costs"), and noting that some of those policies, in some sense, permit employees to exercise discretion. And Plaintiff then alleges that the application of those policies (whatever they may be) results in more favorable terms for white borrowers. Without something more, Plaintiff's claim remains within the realm of "sheer possibility" and fails to cross the *Iqbal* plausibility threshold. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). As the Supreme Court emphasized in *Inclusive Communities*, the causation requirement is necessary to protect "defendants from being held liable for racial disparities they did not create." 576 U.S. 519, 542.

The Court thus dismisses Counts One and Four. This dismissal is without prejudice, however, for Plaintiff claims in briefing that she may have more facts up her sleeve in support of her allegations. *See* [29] at 12–13.

12

### C. State Law Claims

Defendants also move to dismiss Plaintiff's state law claims. The Court need not consider these arguments in detail, however, because, at this juncture, Plaintiff has not stated a viable federal claim to support the Court's exercise of supplemental jurisdiction over her state law claims. 28 U.S.C. § 1367; *Vargas v. Cook Cnty. Sheriff's Merit Bd.*, 952 F.3d 871, 876 (7th Cir. 2020) ("When the claims supporting federal jurisdiction drop out of the case, the usual practice is to relinquish jurisdiction over any remaining state-law claims."). With no federal claim to anchor the case here, the Court dismisses Counts V, VI, and VII without prejudice.

### D. Parent Company as Defendant

Finally, Defendants argue that, even if Plaintiff could state a claim against Wintrust Mortgage (a division of Barrington and the entity that issued Plaintiff's mortgage), she has no basis to sue Wintrust Financial Corporation, the holding company of which Barrington is a subsidiary. [24] at 15. Indeed, absent a basis to pierce the corporate veil, a parent company generally is not liable for the acts of its subsidiary. *See, e.g. Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378 (7th Cir. 2008). Here, the Complaint largely fails to differentiate between Defendants and thus the allegations regarding "Wintrust's policies" appear to refer to the policies of WFC, Barrington, *and* Wintrust Mortgage. *See* [22] at 1. (explaining that the Complaint refers to Defendants collectively as "Wintrust"). Should Plaintiff seek to replead, she must consider which of the Defendants constitute the appropriate parties given the nature of her claims. If indeed she seeks

13

to hold WFC liable for Wintrust Mortgage's allegedly discriminatory policies, she must allege some basis for doing so.

## IV. Conclusion

For the reasons discussed, the Court grants Defendants' motion to dismiss, [23], in its entirety. The dismissal is without prejudice, and if Plaintiff believes she can amend her complaint consistent with this opinion and consistent with her obligations under Federal Rule of Civil Procedure 11, she may do so by October 20, 2023.

Dated: September 27, 2023          ENTERED:

John Robert Blakey
United States District Judge

14